# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **RONALD ODELL KING,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Case No.: 2:19-cv-01923-AMM |
| | ) |
| **CO MCLEMORE, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Ronald Odell King is currently incarcerated by the Alabama Department of Corrections ("ADOC") at Limestone Correctional Facility. Mr. King contends that in 2019, when he was incarcerated at Donaldson Correctional Facility, Correctional Officers Zackery McLemore and Keller Speaks jumped on him, hit him in the back, and beat him in his right eye. *See* Doc. 1. Mr. King alleges that this conduct constituted cruel and unusual punishment in violation of the Eighth Amendment and seeks damages for his injuries. *See id.* Officer McLemore and Officer Speaks dispute Mr. King's allegations, and the court held a bench trial on June 22, 2022. Having heard the testimony at trial and reviewed all the evidence, the court finds that Mr. King failed to prove his claim.

**I.**

As to the factual determinations, the court finds as follows:

1. On August 13, 2019, Mr. King was assigned to Cell 48, Y Block, Donaldson Correctional Facility. Doc. 64 at 12.

2. On August 13, 2019, Mr. King had a medical appointment at Donaldson Correctional Facility. *Id.*

3. On August 13, 2019, Officer McLemore and Officer Speaks were responsible for escorting inmates, including Mr. King, from their medical appointments to their cells. *Id.* at 62–63.

4. Officer McLemore escorted Mr. King to Cell 48, Y Block. *Id.*

5. Mr. King was handcuffed at the time. *Id.* at 64.

6. It is common practice at Donaldson Correctional Facility for inmates to place material in the locking mechanism of their cell doors, and correctional officers routinely check for such material. *Id.* at 30, 64.

7. When Officer McLemore performed a security check of Mr. King's cell door on August 13, 2019, he found cloth material in the locking mechanism of the door and removed the material. *Id.* at 63–64.

8. Mr. King testified that he did not have an opportunity to place any material in the locking mechanism of the cell door, and he did not place any material in there. *Id.* at 9, 13.

9. The parties agree that an incident occurred when Officer McLemore escorted Mr. King to his cell on August 13, 2019. *Id.* at 13–15, 63–64, 75–76.

10. The parties provide different stories about where the incident occurred.

11. Mr. King testified the incident occurred inside his cell as he faced the cell wall. *Id.* at 10, 14.

12. Officer McLemore and Officer Speaks testified they never entered Mr. King's cell and that the incident occurred outside Cell 48 in the hallway of Y Block. *Id.* at 67–68, 77.

13. The parties also provide different stories about the details of the incident.

14. Mr. King testified that he was told to face the inside wall of his cell as Officer McLemore and Officer Speaks swept the cell. He testified that as he was facing the wall, Officer McLemore hit him in the back with his baton, and Officer Speaks hit him in the right eye. Mr. King testified he did not charge or hit the officers and that his life was in danger. *Id.* at 10, 14–15.

15. Inmate Christopher Branch was on Y Block at the time of the incident and corroborated some aspects of Mr. King's narrative. *Id.* at 24, 31–32, 39, 48–52.

16. The parties dispute which cell Mr. Branch occupied at the time of the incident.

17. Mr. Branch and Mr. King testified that Mr. Branch was two cells away from Mr. King in Cell 46. *Id.* at 24, 41.

18. Lieutenant Eddie Watts testified that Inmate Control Systems records indicate Mr. Branch was moved from Cell 46 to Cell 40 at 9:21 a.m. the morning of August 13, 2019. *Id.* at 31–32; Doc. 63-7.

19. The parties dispute whether Mr. Branch could see or hear the incident from Cell 40.

20. Mr. Branch testified that in either Cell 40 or Cell 46, he would have been able to hear the incident. Doc. 64 at 55.

21. Mr. Branch testified that the Y Block was quiet, and inmates used mirrors to observe the hallway. *Id.* at 44–45, 47.

22. Lt. Watts testified that he doubted Mr. Branch could hear or see any incident in Cell 48 from Cell 40. *Id.* at 32.

23. Officer Speaks, Officer Roderick Gadson, and Lieutenant Carl Sanders all testified that Y Block was noisy. *Id.* at 77–78, 94–95, 102.

24. In any event, Mr. Branch testified that he remembered the incident. He testified that by using a mirror, he watched Officer McLemore and Officer Speaks follow Mr. King into his cell. Then he heard commotion, which he described as someone getting pounded on, a scuffle or a fight, knocking, rattling, bumping, and shoes scraping the floor. Mr. Branch testified that he then saw Mr. King exit his cell bleeding from his head. *Id.* at 39–40, 47–52.

25. Officer McLemore testified that Mr. King became upset when he removed the cloth material from the locking mechanism of the cell door. Officer McLemore also testified that Mr. King asked, "what are you doing?" and started running at him. Officer McLemore testified he ordered Mr. King to stop, but Mr. King continued to come toward him, at which time Officer McLemore administered Sabre Red chemical agent. Officer McLemore testified that Mr. King continued to come at him, and he performed a maneuver known as a transport assist takedown to the front. Officer McLemore testified that after he took Mr. King down to the ground, Mr. King complied with his order to calm down. *Id.* at 63–64.

26. Officer Speaks corroborated Officer McLemore's testimony that he told Mr. King to stop and that Mr. King moved towards Officer McLemore. *Id.* at 75–76.

27. Officer Speaks testified that he was not present for the incident until Mr. King was on the ground. *Id.* at 76.

28. Officer McLemore and Officer Speaks testified they did not hit or strike Mr. King in any way and deny the use of a baton. *Id.* at 68, 77.

29. Officer McLemore testified he had no other option and that the transport assist takedown was the best thing to take control of the situation and to protect Mr. King. *Id.* at 70.

30. Ultimately, Mr. King was escorted down the stairs and to the infirmary. *Id.* at 101–02.

31. Mr. King testified that he could not see because of the blood on his face. *Id.* at 16.

32. Officer Gadson testified that there was blood on Mr. King's shirt as he was being transported to the infirmary. *Id.* at 102.

33. After the incident, Captain Deaundra Johnson smelled Sabre Red chemical agent and went to the infirmary, where she saw Mr. King. She testified Mr. King was irate, belligerent, uncooperative, upset, and was screaming and hollering obscenities. She testified she observed Mr. King's body and saw no signs of being hit in the side of the face or in the back. *Id.* at 134–35.

34. At the infirmary, Mr. King took a shower. *Id.* at 99.

35. After the shower, Lt. Sanders took photos of Mr. King and requested the completion of a body chart. *Id.* at 86–88, 99; Doc. 63-1; Doc. 63-4.

36. At the infirmary, a nurse completed an Inmate Body Chart Documentation Form, Doc. 63-1, an Abrasions and Lacerations form, Doc. 63-2, and an Initial Health Review, Doc. 63-3.

37. Current nurses at Donaldson Correctional Facility, Rebecca Raley and Robin Jones, testified that the documents completed in the infirmary should include direct quotations of what Mr. King said and complaints of any kind. Additionally,

nurses are required to accurately record examinations, and nurses must be as specific as possible. Doc. 64 at 113–14, 118, 127–28.

38.   Ms. Raley and Ms. Jones were not the nurses that treated Mr. King on August 13, 2019. *Id.* at 124–25, 132.

39.   The Inmate Body Chart Documentation Form completed in the infirmary shows a small laceration to Mr. King's right eyebrow and that the whites of Mr. King's eyes were red. It does not show any visible injury to the back or complaints of back pain. It also included Mr. King's inmate statement: "Just put my marks on the[re], I don't have no statement." Doc. 63-1.

40.   The Abrasions and Lacerations form noted that Mr. King refused to answer questions about the incident, including the cause of the injury, where it happened, the time of the injury, and the type of object involved. Mr. King's bleeding was described as "small bloody drainage." Mr. King received this nursing intervention: "Cleanse with antiseptic soap. If wound is on the face use Phisoderm or equivalent and rinse with Normal Saline." Additionally, Mr. King was given teaching on signs of infection or impaired circulation and follow-up instructions. The report indicates that no extra care was needed for Mr. King's laceration, and he did not require direct pressure or a Band-Aid. Doc. 63-2; *see also* Doc. 64 at 120–21, 130–31, 181.

41. The Initial Health Review noted that Mr. King had a "small laceration to R eyebrow" and that the "whites of [his] eyes [were] red." Doc. 63-3.

42. Various witnesses testified that the laceration was consistent with a transport assist takedown. Doc. 64 at 92, 123, 131, 141, 174.

43. The application of Sabre Red chemical agent can lead to redness in the eyes. *Id.* at 93, 115.

44. After the incident, Lt. Sanders completed a Duty Officer Report and an Incident Report. *Id.* at 84–85; Doc. 63-8; Doc. 63-9.

45. Lt. Sanders gathered statements from Officer McLemore and Officer Speaks, but he did not gather a statement from Mr. Branch. Lt. Sanders testified that if he had known there was an inmate witness, he would have gathered a statement from the inmate witness as well. Doc. 64 at 88–90.

46. Lt. Sanders's investigation into the matter concluded that Mr. King was the suspect and Officer McLemore was the victim. *Id.* at 90.

47. Captain Johnson prepared a Use of Force Investigation Report after the incident. In preparing the report, she received handwritten statements from Officer McLemore and Officer Speaks. Captain Johnson concluded that Mr. King was the aggressor in the incident. She did not find any inappropriate touching by Officer McLemore or Officer Speaks and concluded that the use of force was justified. *Id.* at 134, 136–40; Doc. 63-10; Doc. 63-11; Doc. 63-12.

48. Sergeant Trenton Eads conducted Mr. King's disciplinary hearing from the incident. The circumstances of the disciplinary violation were described on the Disciplinary Report as: "You inmate King did attempt to head butt Officer McLemore while being put in your assigned cell after returning from a medical appointment[] while Officer McLemore was removing material from your cell door latch[.]" Mr. King refused to sign for notice of the hearing and pled not guilty. Sgt. Eads heard testimony from Officer McLemore and Mr. King, received handwritten notes submitted by Mr. King, and reviewed Officer McLemore's answers to questions submitted by Mr. King. Sgt. Eads found Mr. King guilty. As a result, Mr. King lost privileges, was subject to a custody review, and was placed in segregation. Doc. 64 at 152–55; Doc. 63-6.

49. Mr. King was sent back to the I Block after the incident. Doc. 64 at 16.

50. Mr. King underwent an X-Ray of his thoracic spine the day after the incident. The reason given for the X-Ray was "Altercation C/O Back Pain." The X-Ray findings were: "Multiple views of the thoracic spine demonstrate no acute fracture of listhesis. No significant degenerative changes are noted. Substantial cephalad and inferior obscuration." The impression from the X-Ray was: "No acute osseous abnormality of the thoracic spine." Doc. 63-5 at 39; *see also* Doc. 64 at 168–69.

51. Mr. King was later transferred to the Limestone Correctional Facility. Doc. 64 at 17.

52. Mr. King testified that he suffered serious injuries to his right eye and back and continues to suffer from scoliosis to his back. *Id.* at 9, 15.

53. Mr. King had regular access to medical care after the incident. In fact, he was visited daily by a nurse from August 14, 2019 through December 18, 2019. Doc. 63-5 at 2.

54. Mr. King did not make follow-up complaints relating to the incident. Instead, in the months following the incident, Mr. King's medical complaints related to sleep issues, Doc. 63-5 at 6–8, 11, 19, depression, Doc. 63-5 at 11, right ear problems, Doc. 63-5 at 24, 28, 36, and dermatitis, Doc. 63-5 at 30–31, 34–35. *See also* Doc. 64 at 170–73.

55. Back pain is mentioned only once in Mr. King's subsequent medical records. In January 2022, Mr. King specified that lifting was the cause of his back pain. Doc. 64 at 175–77; Doc. 63-18 at 34.

56. Based on the witnesses' demeanor and credibility, and based on the evidence presented, the court primarily credits Officer McLemore and Officer Speaks's version of events. Officer McLemore and Officer Speaks's testimony was consistent and corroborated not only by the other ADOC employees' testimony, but also by internal ADOC documents such as the statements taken at the time of the

incident and the ensuing Disciplinary Report, Duty Officer Report, Incident Report, and Use of Force Investigation Report.

57. Separately, the court assigns little weight to Mr. King's testimony. Mr. King was hostile, combative, and agitated during the bench trial, making it easy to believe him capable of anger when cloth material was found in and removed from his cell door lock. Indeed, Mr. King was placed in a holding cell during his bench trial after he was counseled to control his angry outbursts. Mr. King was advised that he could return to the courtroom if he was able to do so, and he elected not to return.

58. Separately, the court assigns little weight to Mr. Branch's testimony. Although Mr. Branch corroborated portions of Mr. King's narrative, he was not interviewed as a witness at the time of the incident, he was not interviewed as part of the disciplinary hearing, and he and Mr. King have recently connected at Fountain Correctional Facility. *See* Doc. 64 at 25–26. Additionally, the court discredits Mr. Branch's testimony regarding his ability to see and hear the incident based on his location and the noise in the Y Block.

59. Separately, the medical evidence does not substantiate Mr. King's testimony that he suffered serious injuries. Although the evidence establishes that Mr. King experienced a laceration to his right eyebrow that bled as he was led to the infirmary, the laceration was treated with soap and water and did not require any further follow-up treatment, not even a Band-Aid. The medical evidence does not

11

substantiate any claims of an injury to Mr. King's back. After the back X-ray the day after the incident, there is no further mention of continued back problems related to the incident despite Mr. King's repeated access to medical care.

60. The court finds that Officer Speaks did not use force against Mr. King.

61. The court finds that Officer McLemore did use force against Mr. King, though not to the extent nor in the manner that Mr. King testified.

**II.**

Based on these findings, the court renders the following conclusions of law:

1. Mr. King brings his claim under 42 U.S.C. § 1983 for excessive force in violation of the Eighth Amendment.

2. Mr. King bears the burden of proving that the defendants used excessive force. *Patel v. Lanier Cnty.*, 969 F.3d 1173, 1185 (11th Cir. 2020).

3. A correctional officer violates the Eighth Amendment when he or she uses force "maliciously and sadistically to cause harm," as opposed to using force "in a good-faith effort to maintain or restore discipline." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *Harris v. Chapman*, 97 F.3d 499, 505 (11th Cir. 1996).

4. To determine whether a correctional officer used force "maliciously and sadistically to cause harm," the factfinder considers: (1) "the extent of injury suffered by an inmate," (2) "the need for application of force," (3) "the relationship between that need and the amount of force used," (4) "the threat 'reasonably

perceived by the responsible officials,'" and (5) "'any efforts made to temper the severity of a forceful response.'" *Hudson*, 603 U.S. at 7 (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).

5.  "The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." *Id.*; *Harris*, 97 F.3d at 505. "'[T]he use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury.'" *Wilkins v. Gaddy*, 559 U.S. 34, 34 (2010) (quoting *Hudson*, 502 U.S. at 4) (alteration in original). "An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Id.* at 38.

6.  In weighing the factors, courts "must also give 'a wide range of deference to prison officials acting to preserve discipline and security,'" especially for "'decisions made at the scene of a disturbance.'" *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007) (quoting *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990)) (cleaned up).

7.  In addition to affirmative malfeasance, "an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance." *Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002).

8.     An inmate's resistance of commands from correctional officers justifies force to "compel compliance" and ensure security. *Brown v. Smith*, 813 F.2d 1187, 1189 (11th Cir. 1987); *Miles v. Jackson*, 757 F. App'x 828, 830 (11th Cir. 2018) (per curiam) (finding there was a need for force when inmate failed to comply with orders and evaded attempts to require compliance).

9.     "The use of a takedown is not disproportionate to the need to control an inmate who has failed to obey a jailer's orders." *Miles*, 757 F. App'x at 830 (cleaned up).

10.    Mr. King has not established that Officer McLemore or Officer Speaks used force maliciously or sadistically to cause harm. Instead, *first*, the evidence establishes that there was a need for force because Mr. King threatened Officer McLemore and resisted his verbal orders. Although Mr. King was handcuffed at the time of the incident, he threatened Officer McLemore when he attempted to head butt him and came after him. Mr. King continued to pose a threat after the application of Sabre Red chemical agent because he continued to physically threaten Officer McLemore and did not respond to commands to cease his combative behavior. There was a need for Officer McLemore to apply force to subdue Mr. King, who was combative, physically threatening, and unresponsive to Sabre Red chemical agent and verbal commands. *Second*, the force Officer McLemore used when he applied Sabre Red chemical agent and performed a transport assist takedown was

proportional to the need for force. *Third*, Officer McLemore reasonably perceived that Mr. King's behavior was threatening. *Fourth*, the use of force was tempered because Mr. King was immediately taken for medical care. *Fifth*, Mr. King failed to show that the use of force caused him serious injury; indeed, the only treatment deemed necessary after the incident was the cleansing of his laceration. No pressure or Band-Aid was applied. Mr. King has failed to establish that Officer McLemore and Officer Speaks used excessive force against him. As a result, Officer McLemore and Officer Speaks did not violate Mr. King's Eighth Amendment rights.

## III.

Mr. King has not met his burden to demonstrate that Officer McLemore and Officer Speaks acted with the requisite intent to support his claim of excessive force under the Eighth Amendment. The evidence presented at trial leads the court to find that Officer McLemore used force in good faith to restore discipline when Mr. King became verbally and physically threatening, and the court concludes that Officer McLemore and Officer Speaks did not violate Mr. King's Eighth Amendment rights. Judgment is **ENTERED** in favor of Officer McLemore and Officer Speaks. The clerk is **DIRECTED** to close this file.

**DONE** and **ORDERED** this 25th day of January, 2023.

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE